D.O. ("the mother") appeals from judgments in six separate cases terminating her parental rights to her six minor children, T.O., E.O., C.O., M.O., K.O., and S.O., and awarding permanent custody of the children to the State Department of Human Resources ("DHR"). The children's father was also a party to each termination action and the juvenile court's judgments also terminated his parental rights; however, he has not appealed from the judgments of the juvenile court.
 I.
DHR's report to the juvenile court, which was submitted to the court before it held the hearings on the termination of the mother's and father's parental rights, indicated that DHR first became involved with the mother's family in 1988, when T.O. and E.O. were taken into protective custody by DHR. It was noted then that both the mother and the father were abusing alcohol. C.O. was born in December 1991. In April and May 1992, DHR received two child-abuse and neglect ("CAN") reports concerning C.O., one of which alleged that the mother had been intoxicated when she picked up a food voucher. DHR found neither report to be "indicated"; however, a local human-resources agency did open a protective-services file to provide services to the mother concerning her alcohol use.
In November 1992, DHR received another report concerning the mother; that report alleged that the mother had been intoxicated when she took C.O. to a hospital emergency room. The report was marked "reason to suspect." In June 1993, the mother was admitted to an inpatient alcohol-abuse program. In September 1993, the mother was admitted to a hospital because of premature labor; at that time, her blood-alcohol content was reported as .18 %. After giving birth to M.O., her fourth child, the mother was placed on Antabuse, a drug used to treat abusers of alcohol. During the next two years, custody of T.O. and E.O. was restored to the mother, and the local human-resources agency closed its protective-services file concerning the mother.
In February 1998, the mother's protective-services file was reopened based upon a report that C.O. had been physically abused. The report alleged that C.O. had been present during a physical altercation between the mother and the father in which alcohol was involved. In June 1998, a hospital telephoned DHR and reported that the mother appeared to be intoxicated when she brought one of the children to the emergency room. A blood test revealed that the mother's blood-alcohol level at that time was .242 %.
On July 2, 1999, police were dispatched to the mother's residence in response to a domestic-dispute call. When they arrived they found both the mother and the father intoxicated and unable to care for the children. The children were placed in foster care at that time. Two of the children, T.O. and E.O., were initially placed with their aunt, R.O. However, T.O.'s behavior deteriorated while he was in R.O.'s custody. An allegation of drug abuse was made against R.O., and she refused a drug test. In February 2001, R.O. agreed to keep T.O. and E.O. only until another placement could be made for them.
On February 27, 2001, the mother reported to a local hospital while in "false" labor; at that time, her blood-alcohol level was found to be .266 %. The mother's sixth child, S.O., was born in April 2001; S.O. was immediately placed in foster care by DHR. In July 2001, the mother met with representatives of DHR, and an individualized *Page 441 
service plan ("ISP") was agreed to.[1] The mother was advised by DHR that proceedings to terminate her parental rights would begin if she did not enter an inpatient substance-abuse facility. The mother entered a substance-abuse facility on July 20, 2001, and was released from the facility on October 4, 2001.
DHR's report to the juvenile court indicates that upon her release from the substance-abuse facility the mother was to find a house, to secure employment, to secure transportation, to remain alcohol-free, and to pay child support. That report additionally noted that a second ISP was completed on January 10, 2002; however, at that time, a DHR representative also noted that DHR would be filing a petition for termination of parental rights in January 2002.
At the juvenile court's hearings on DHR's petitions seeking termination of the mother's and the father's parental rights, 12 witnesses testified. Fannie Kelley, a DHR social worker, testified that she had been the mother's caseworker from November 1999 until August 2001. Kelley testified that the mother had not requested services for her alcohol problem until the sixth child, S.O., was born. Kelley also testified that between February 2000 and July 2001 DHR had held five separate ISP meetings concerning the mother but that she had failed to send the mother letters notifying her of many of those meetings. Kelley testified that between November 1999 and April 2000 she had offered virtually no services to the mother and had failed even to arrange visitation between the mother and the children. Kelley testified that the plan for the children, as late as April 2, 2001, was for the children to remain in long-term foster care but that that plan had changed when the juvenile-court judge had ordered DHR to initiate termination proceedings as to all of the children. According to Kelley, the juvenile-court judge "wanted this to be done by October the 15th of 2001, and if it [were] not done he wanted to know the reason." Kelley testified that the mother had met all of the requirements of her April 2001 ISP.
Heather Evans testified that she had been the mother's caseworker from August 6, 2001, until the time of the termination hearings in the summer of 2002. Evans testified that she had been assigned to the family while the mother was at the inpatient alcohol-treatment facility in 2001. Evans testified that the mother had accomplished virtually all of the goals set out in her most recent ISP. Evans further testified that she had not investigated any of the mother's relatives for possible placement of the children.
Edith Couch, a licensed professional counselor, testified that she had been counseling the mother regarding her alcohol addiction and that she was also attempting family counseling. Couch also testified that the mother had had one isolated relapse after she had completed the most recent inpatient alcohol-treatment program. Couch testified that at the time of the hearings the mother and her children required less counseling and that their interactions were appropriate.
E.O., the mother's 13-year-old daughter, testified that she wanted her mother's parental rights to be terminated so that she could be adopted. However, E.O. also testified that she loved her mother and that during a recent visit she had seen no signs that the mother was using alcohol. *Page 442 
Robin Bridges, the program director for the New Directions substance-abuse-treatment program, testified that he had been treating the mother. His testimony indicated that the mother had successfully completed approximately 15 weeks of treatment and counseling but that she could no longer afford to attend the program. His testimony also indicated that DHR often paid for such services but that DHR had not done so in the mother's case. Bridges also testified at length about the nature of and the procedure for obtaining substance-abuse treatment.
Cynthia Glenn, a service supervisor at DHR, testified that she had inspected the mother's residence. Glenn testified that, although it was not large enough for six children, it was clean and neat and had running water, normal home appliances, and certain amenities. Glenn testified that she had not received a request that DHR pay for the mother's counseling at the substance-abuse center. Glenn further testified that the mother had been meeting all of the goals specified in her January 2002 ISP when the petition to terminate the mother's parental rights had been filed.
Carol Clarkson, the manager of sales and services for TRI Staffing, testified that the mother had worked for them but had been laid off. Clarkson testified that she had not received any complaints about the mother and that the mother continued to inquire weekly regarding employment opportunities.
Mary Helen Andrade, a counselor with Covenant Services, testified that she had counseled the mother, providing cognitive and behavioral therapy. Andrade testified that the mother had remained sober, had learned to communicate better, and had done what DHR had requested of her. Andrade further testified that the mother had adjusted her life to comply with DHR's ISP goals and that, despite not yet being financially self-sufficient, the mother had purchased clothing for the children.
Jack Johnson, a family-support worker with Covenant Services, testified that he had observed the mother on a regular basis, had provided transportation for her, and had observed her visitations with her children. He testified that the bonds between the mother and the children were being strengthened and that several of the children wanted to know when they would be returning to the mother's care. Johnson testified that he never saw alcohol in the mother's house and, with the exception of a single relapse, he had never seen her under the influence of alcohol.
Velma Northrup, the director of Covenant Services, testified that the mother had kept all of her scheduled appointments with Covenant Services. Northrup also testified that she had made a number of unannounced nighttime visits to the mother's new residence and had seen no evidence that the mother was using alcohol. Northrup testified that the mother was attending church and that the women of the church had been a support group for the mother.
The mother testified that she had had five jobs following her October 2001 discharge from the inpatient alcohol-treatment center. Each of those jobs had been either part-time or temporary, but the mother had continued to apply for jobs independently and through a temporary-employment agency. The mother admitted that she had had a relapse, and she testified that she has continued to see her various counselors. The mother testified that she was complying with her ISP, and she indicated that she was unsure why DHR had insisted on seeking to terminate her parental rights. At the time of the hearings, the mother was scheduled to interview for a job with a chicken processor *Page 443 
and was continuing to maintain her residence.
 II.
A nonparent who seeks to terminate a parent's parental rights must prove by clear and convincing evidence that the children are dependent and that there are no viable alternatives to the termination of parental rights. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). Section 26-18-7(a), Ala. Code 1975, states, in pertinent part:
 "(a)If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child . . . .
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the [DHR] . . . leading toward the rehabilitation of the parents have failed.
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated."
Section 26-18-7(b) further provides that if a child is not in the custody of its parents, the juvenile court may consider whether the parents are providing monetary support for the child, whether they are regularly exercising visitation with the child, and whether they are adjusting their "circumstances to meet the needs of the child." On appeal, the juvenile court's judgment on those matters is presumed correct, and it will not be reversed unless it is so unsupported by the evidence that it is plainly and palpably wrong. M.H.S. v. State Dep't of Human Res.,636 So.2d 419, 421 (Ala.Civ.App. 1994).
 III.
Although we are aware of the legal principles that control a parental-rights-termination case and of the presumption accorded a trial court's judgment when it has heard evidence ore tenus, after reviewing the record in this case, we must conclude that the decision of the juvenile court to terminate the mother's parental rights is not supported by clear and convincing evidence.
The termination-hearing report made by DHR indicates that there may have been a time when termination of the mother's *Page 444 
parental rights would have been proper. However, even assuming that to be true, termination of the mother's parental rights was no longer warranted at the time of the juvenile court's hearings on the issue of termination. The record reflects that, at the time of those hearings, the mother had accomplished nearly all of the goals set out in her most recent ISP and was actively working to complete the others. The evidence and testimony shows that she has unceasingly pursued work and that, although her previous jobs have been only temporary or part-time, she has continued to apply for work. She has secured stable housing. She is sober, and she has remained so, with only one isolated relapse since her discharge from the inpatient alcohol-treatment facility in 2001. She continued outpatient alcohol treatment until she could no longer afford it, and the evidence shows that, although DHR in the past has provided financial assistance for parents in the mother's position, it apparently has not done so for the mother. The mother has also kept all of her appointments with Covenant Services, where she receives behavioral therapy to overcome the negative cognitive attitude often present in recovering alcohol abusers. Lastly, she has been visiting with her children regularly and is attempting to reestablish her relationship with them, both individually and through family counseling.
This court has consistently held that the existence of evidence ofcurrent conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence. See T.H. v. State Dep't of Human Res., 740 So.2d 1089
(Ala.Civ.App. 1998); Bowman v. State Dep't of Human Res., 534 So.2d 304
(Ala.Civ.App. 1988); Hamilton v. State, 410 So.2d 64 (Ala.Civ.App. 1982). The trial court's decision to terminate the mother's parental rights was premature, considering the evidence indicating that the mother has made a continuing effort to change her circumstances and that she was making significant progress at the time of the termination hearings; therefore, the trial court's judgments were plainly and palpably wrong.See K.A.C. v. Jefferson County Dep't of Human Res., 744 So.2d 938
(Ala.Civ.App. 1999); see also L.A.G. v. State Dep't of Human Res.,681 So.2d 596 (Ala.Civ.App. 1996).
We further note the particularly close similarity between the facts of this case and those of V.M. v. State Department of Human Resources,710 So.2d 915 (Ala.Civ.App. 1998), which was also an appeal from a judgment of the Calhoun County Juvenile Court. In V.M., we stated that we were
 "concerned that the decision to file the petitions to terminate parental rights in these cases was made by the trial court, not by DHR. We are especially concerned that the trial court's instruction to DHR to file the petitions came at a time when the record demonstrates that the mother was making progress toward meeting the goals DHR had established for her. Pursuant to the terms of a consent judgment in federal litigation, DHR has an affirmative duty to facilitate family reunification whenever that goal is possible. See generally R.C. v. Nachman, 969 F. Supp. 682
(M.D.Ala. 1997). Rehabilitation of a parent and family reunification take time."
710 So.2d at 921. Here, as in V.M., the evidence reflects that, at the time the trial court heard the evidence regarding termination of the mother's parental rights, the mother was in the process of rehabilitating herself, and there was at least the possibility that the services rendered to the mother by DHR would lead to a reunification with at least some of her children. In the *Page 445 
summer of 2002, when the juvenile court held three separate hearings as to the proposed termination of the mother's parental rights, the mother was making significant progress in adjusting her circumstances to meet the needs of her children; therefore, a viable alternative to termination of her parental rights existed. § 26-18-7(b), Ala. Code 1975; StateDep't of Human Res. v. L.W., 597 So.2d 703 (Ala.Civ.App. 1992).
As we noted in V.M.,
 "This court fully recognizes the difficulty of cases such as this. Nevertheless, the termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in these cases `does not rise to the level of being so clear and convincing as to support termination of the parental rights of the mother, such action being the last and most extreme disposition permitted by statute.' East v. Meadows, 529 So.2d 1010, 1012 (Ala.Civ.App. 1988). See also L.A.T. v. State Dep't of Human Resources, 588 So.2d 471
(Ala.Civ.App. 1991)."
710 So.2d at 921. For the reasons stated above, we reverse the judgments of the trial court terminating the mother's parental rights, and we remand the cases for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
YATES, P.J., and CRAWLEY, J., concur.
THOMPSON and MURDOCK, JJ., concur in the result.
[1] DHR prepared numerous ISP's for the mother. We will refer only to those as to which witnesses testified.