SMITH, Justice
(dissenting).
I respectfully dissent.
The majority reverses the judgment of the trial court terminating T.V.’s parental rights as to N.V. and remands this case because “[t]he record as it currently stands ... does not demonstrate that the trial court examined all the viable alternatives to the termination of T.V.’s parental rights.” 971 So.2d at 8. The majority opinion states:
“There is no indication that DHR has made any recent efforts to facilitate reunification; there has not been any examination of T.V.’s current ability or willingness to care for N.V. since B.S. received permanent legal and physical ■custody in 2000. The trial court did not order DHR to perform a home study nor did it hear any testimony by DHR social workers regarding T.V.’s current circumstances. Thus, it is not clear from the record what possible viable alternatives might have been found.”
971 So.2d at 7.
An understanding of the chronology of events in this case is critical in determining whether the trial court erred in terminating T.V.’s parental rights on the basis that DHR did not reinstitute reunification efforts, did not conduct a home study, and/or did not explore other viable alternatives, including other potential relative resources, to the termination of T.V.’s parental rights.
The child, N.V., was born on June 2, 1999. The evidence indicated that the child’s mother, T.V., used crack cocaine before the child’s birth. It is uncontro-verted that the child has never resided with or been in T.V.’s custody. T.V. was arrested at the hospital following N.V.’s birth, and the child was placed with the custodian, B.S., and her husband, C.S., when T.V. left the hospital following his birth. DHR filed a dependency petition on June 8, 1999.
The trial court’s order states that “a seventy-two hour shelter care hearing was held on June 10, 1999, wherein the mother agreed to [B.S.’s] receiving the temporary legal and physical custody of the child as a relative resource placement.” Tracy Sher-rill, a DHR social worker, testified that B.S. was not licensed as a foster parent *13 but was considered a relative placement because T.V. and B.S. were “cousins by marriage or something and we were able to consider that a relative.” Both DHR and T.V. considered B.S. a relative of the child’s.
After DNA testing excluded as a father the only person named by T.V. as N.V.’s father, the trial court, on December 14, 1999, adjudicated N.V. to be dependent.
Unfortunately, DHR’s efforts for reunification of T.V. and N.V. from June 1999 to the date of the permanency hearing in December 2000 failed because TV. did not avail herself of the services offered by DHR. She did not attend substance-abuse treatment, she failed to secure housing, and she failed to keep DHR or B.S. apprised of her whereabouts.
N.V. was 18 months old and had always resided with B.S. when the trial court, at the permanency hearing in December 2000, awarded custody to B.S. B.S. believed she was being awarded “permanent custody” of N.V. There is no indication that DHR continued in its reunification efforts after B.S. was awarded custody following the permanency hearing. Furthermore, there is no indication that the court conducted an ongoing court review after the child was placed with B.S. and her husband following the permanency hearing.
N.V. was four years old when TV. first filed a motion with the court seeking both visitation and “ultimately the return of custody.” I have reviewed the record in its entirety, and I note that there are conflicts in testimony regarding TV’s efforts to visit N.V. and TV’s contention that B.S. and her husband interfered with her visitation efforts. The trial court’s findings in its order of January 13, 2005, in support of its decision to grant B.S.’s petition to terminate TV’s parental rights are supported by the evidence presented at trial:
“The court finds from clear and convincing evidence, competent, material and relevant in nature that [TV] is unable to discharge her responsibilities to and for [N.V.] and her conduct or condition is such as to render her unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future.
“In determining that [TV] is unable to discharge her responsibility to and for the child, the court has considered the following:
“[TV] has periodically abandoned her child. There has been a voluntary and intentional relinquishment of the custody of the child by his mother, or a withholding from the child, without good cause or excuse, by the mother, of her presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or a failure to perform the duties of a parent. While [TV] asserted she always meant to get [N.V.] back when she agreed to [B.S.’s] having his custody, there were many four-month or longer periods during the past five years when she abandoned him. However, there is no presumption of abandonment because [TV] filed her motion to enforce visitation with him prior to [B.S.’s] filing this petition.
“[TV] has an extensive history of excessive use of controlled substances of such duration or nature as to render her unable to care for the needs of the child. She admitted that she began using drugs in the 1980’s and became an addict in the early 1990’s. She completed a thirty-day residential program in 1995 or 1996, failed to complete a court-ordered residential program in 1999, and completed an outpatient program in *14 2000. However, [T.V.] testified that she was an addict until July 20, 2002. She asserts that she has remained drug-free since that time. She has been required to submit to drug testing for employment on several occasions and has passed the tests. While she is now drug-free, her previous addiction contributed to her inability to now care for [N.V.] because so much time has gone by that the child does not know her.
“There is evidence that [T.V.] abused the child by using crack cocaine prior to his birth. [N.V.] has never been in [T.V.J’s custody. The child was placed with [B.S.] when he left the hospital following his birth.
[[Image here]]
“Reasonable efforts by the Department of Human Resources leading toward the rehabilitation of [T.V.] failed. Individualized Service Plans (ISPs) were held immediately upon the filing of the dependency petition. They addressed housing and drug treatment. DHR was unable to prepare a home study on [T.V.] because she did not have a home and sometimes her whereabouts were unknown during the planned reunification process between removal and permanent placement. There was a one-year period between the adjudication of dependency and the permanency hearing for [T.V.] to meet the goals to achieve reunification. [T.V.] did not comply with drug treatment and ultimately agreed to permanent placement with [B.S.].
[[Image here]]
“[T.V.] has failed to provide for the material needs of [N.V.] or to pay a reasonable portion of his support where she is able to do so. By her own testimony, she was a drug addict until he was three years old so that the court finds that she chose to support her habit rather than her child. [T.V.] asserted that she provided a bassinet and monitors and a few other baby items when the child was born but [B.S. and her husband] deny this. She testified that she set up an account for [N.V.] but did not divulge its existence to the child’s custodians and it has an approximate $25 balance as of this hearing date. She testified that she worked from February 2003 until March 2004, June 2004 until September 2004, and currently from the fall of 2004. She testified that her husband always worked. However, money order receipts entered into evidence reflect that she has paid $270 in total support and only began paying support in March 2004. [B.S. and her husband] have supported the child continuously for five years.
“[T.V.] has failed to maintain regular visits with [N.V.] The permanency agreement reached in December 2000 included visitation to be arranged by [B.S. and her husband] and [T.V.]. [B.S. and her husband] have not moved. [T.V.] has lived in the same town. Very little effort has been made by the mother to visit her child. Her descriptions of attempts to visit were not time or date specific and related to [B.S. and her husband] leaving when [T.V.] came by or not coming to the door. It is no wonder when she was not around the child for years that the child grew up with the belief that [B.S. and her husband] were his parents. It is not unreasonable for them to have been apprehensive to allow sporadic visitation with a mother who was a drug addict or former drug addict that the child did not know. [T.V.] did maintain regular supervised visitation beginning in 2004 pursuant to her request to the court for assistance enforcing visitation. However, it was not revealed to the court until this termination hearing that the child did not know who *15 he was visiting due to the absence of the mother in his life during the preceding years. According to her testimony, [T.V.] knew how to contact a judge to help her enroll in drug treatment. She knew how to contact a Decatur lawyer about visitation. There was testimony that she had completed high school and possibly some college and is obviously intelligent. No explanation was given by [T.V.] why she failed to contact the court regarding these visitation issues until the child was four-and-a-half years old. [B.S.’s husband] testified that during 1999-2000 [T.V.] visited her son four to six times, from 2000-2001 she did not visit her child and from 2001-2002 she did not visit her child. During 2003 he asserted that she did not visit her child before she filed a motion with the court in December 2003 to exercise visitation. [T.Y.] proffered the excuse that [B.S. and her husband] did not make her feel welcome but the court does not find that to be a reasonable excuse to not visit her child for virtually four-and-a-half years.
“[T.V.] has failed to maintain consistent contact or communication with the child. [B.S. and her husband] have lived in the same place since the child was born. [T.V.] has lived in the same town. They have common relatives. [B.S. and her husband] have changed their phone number once in five years. [T.Y.] has never spoken to [N.V.] on the telephone. [B.S.’s husband] testified that she called a little in 2000-2001 and did not call at all between 2001 and 2003. [B.S.] and [T.V.] related that [T.V.] did call [B.S. and her husband] on [N.VJ’s second birthday to arrange a visit. However, [T Y.] was incarcerated and was not given a pass for the visitation. [T.Y.] gave [N.V.] a race car for Christmas when he was a toddler and has given him no other Christmas or birthday presents. She testified that she bought him a guitar but was never able to give it to him even though she lived in the same town and did not leave it for him at B.S.’s residence or mail it to him.
“There has been a lack of effort on the part of [T.V.] to adjust her circumstances to meet the needs of the child. [T.V.] was a drug addict until the child was three years old. While she has remained drug free since that time, established a home with [her husband] and her older son, has had sporadic employment, and is active in her church, she waited until [N.V.] was four-and-a-half years old to try to establish a relationship with him. The court is aware that these accomplishments did not occur without a great deal of effort and time, but there has been no explanation why she ignored [N.V.] for so long and failed to forge a relationship with him while she continued to improve her life.”
Despite these detailed findings, the majority remands the case for the trial court to consider viable alternatives to terminating T.V.’s parental rights because there was no updated home study to explore relative resources; no recent reunification efforts by DHR; and no consideration by the trial court of other alternatives such as maintaining the status quo — custody with B.S. and visitation with T.V. — as recommended by the guardian ad litem.
I respectfully dissent because I do not believe that a remand to the trial court is warranted. The court has already considered T.V.’s motion for visitation and “ultimately return of custody” and found that not to be a viable alternative. Specifically the trial court’s order states:
“[T]here are no viable alternatives to termination of the parental rights of the mother. It appears that B.S. is related to [T.V.] by marriage. The child’s guardian ad litem argued that the peti *16 tion should be denied and the case remain status quo. However, ‘status quo’ for [N.Y.] is living with [B.S. and her husband] and not visiting with or knowing [T.V.] Supervised visitation has occurred with the child having no idea who [T.V.] is and why he should visit with her or his half-brother or her husband. [T.V.] agreed to the permanent placement of the child with [B.S. and her husband] four years ago. [N.V.] has lived with them continuously since he came home from the hospital. He knows them as his parents and their children as his sisters. He does not know who [T.V.] is. While the court is aware of the presumption that a child should be placed with his parents, the court finds that his parents are [B.S. and her husband] — the only parents he has ever known. No expert was called to explain away the possibly devastating consequences to this five-year-old child upon finding out that his family was not really his family and he would have to go live with strangers who lived in the same town with him but didn’t really try to develop a relationship with him for five years. Ultimately, despite the parental presumptions of his biological mother, the court must consider what is in the best interest of [N.V.]. [T.V.] has waited too long to develop a relationship and bond with him so that she is unable to discharge her responsibilities to him and her conduct of omission renders her unable to properly care for him. This conduct cannot change in the future because she cannot bring back the first five years of her child’s life.”
Initially, I recognize that we must give deference to the trial court’s findings:
“When this Court reviews a trial court’s child-custody determination that was based upon evidence presented ore ten-us, we presume the trial court’s decision is correct: ‘ “A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong....”’ Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. ‘In child custody cases especially, the perception of an attentive trial judge is of great importance.’ Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981). In regard to custody determinations, this Court has also stated: ‘It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.’ Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996).”
Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
The trial court clearly found, despite the conflicts in testimony, that T.V. had made no meaningful efforts to support, visit, or even communicate with N.V. from the date of his birth in June 1999 until she filed her court proceeding in December 2003.
Section 26-18-7, Ala.Code 1975, provides, in pertinent part:
“(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or *17 condition of the •parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
“(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
“(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
[[Image here]]
“(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
“(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
[[Image here]]
“(3) Failure by the parents to maintain consistent contact or communication with the child.
“(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
“(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a re-buttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period.”
The trial court, in accordance with the considerations mandated by § 26-18-7, Ala.Code 1975, outlined in detail its findings that there was no viable alternative to the termination of T.V.’s parental rights. The trial court found that T.V. had, in fact, abandoned her child, irrespective of whether a presumption of abandonment should be applied because T.V. had filed her motion to enforce visitation before B.S. filed the petition to terminate T.V.’s parental rights. I agree with the trial court that the evidence supports a finding that T.V. had, in fact, abandoned N.V. from his birth in June 1999 to the date she filed her petition for visitation and ultimately custody.
The majority states that “[t]his case is not about whether N.V. would have to leave B.S. and her family and live with strangers.” 971 So.2d at 8. Rather, the majority holds that “the [trial court’s] conclusion that there are no viable alternatives to terminating T.V.’s parental rights is not supported by clear and convincing evidence.” 971 So.2d at 10.
That conclusion of the majority, however, fails to properly consider the specific ore tenus findings of the trial court. Although it is true, as the majority points out, that the trial court heard no expert testimony “ ‘explaining] away the possibly *18 devastating consequences to this five-year-old child upon finding out that his family was not really his family,’ ” 971 So.2d at 8 (quoting trial court’s order), the trial court correctly noted that, nonetheless, the status quo was no viable alternative to the termination of T.V.’s parental rights because N.V. would be, in essence, visiting with a total stranger, and T.V.
“has waited too long to develop a relationship and bond with him so that she is unable to discharge her responsibilities to him and her conduct of omission renders her unable to properly care for him. This conduct cannot change in the future because she cannot bring back the first five years of her child’s life.”
Furthermore, T.V. offered no explanation regarding “why she ignored [N.V.] for so long and failed to forge a relationship with him while she continued to improve her life.”
The majority suggests that had DHR conducted a current home study or attempted current reunification efforts or explored other potential relatives, particularly given the mother’s recently improved situation, other options to the termination of her parental rights could have been considered.
As to the issue of the home study, the majority concedes that T.V. generally cites cases in which DHR itself had petitioned to terminate parental rights and that it is not clear from our caselaw whether DHR has a duty to perform a home study for a termination-of-parental-rights proceeding in which it is not the petitioner. Under circumstances such as those here, I would hold that a DHR home study at this juncture, while perhaps helpful, is not required, particularly in light of the reasonable efforts by DHR during the first 18 months of N.V.’s life, which efforts failed because of the mother’s faults and bad habits. Section 12-15-65, Ala.Code 1975, states in pertinent part:
“(g) If the court enters an order removing a child from his or her home or continuing a child in a placement outside of his or her home pursuant to this title, the order shall contain as specific findings, if warranted by the evidence, all of the following:
“(1) That continuing the placement of a child in his or her home would be contrary to the best interests of the child.
“(2) That reasonable efforts have been made to prevent or eliminate the need for removal of the child from his or her home, or that an emergency situation exists which requires the immediate temporary removal of the child from his or her home due to the emergency situation.
“(3) That reasonable efforts have been made or will be made to reunite the child and his or her family, or that efforts to reunite the child and his or her family have failed.
[[Image here]]
“(m) As used in this chapter, ‘reasonable efforts’ refers to efforts made to preserve and reunify families prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child’s home, and to make it possible for a child to return safely to the child’s home. In determining the reasonable efforts to be made with respect to a child, and in making such reasonable efforts, the child’s health and safety shall be the paramount concern. If continuation of reasonable efforts is determined to be inconsistent with the permanency plan for the child, reasonable efforts shall be made to place the child and to complete whatever steps are necessary to finalize the permanent placement of the child.”
*19 The requirements of § 12-15-65 were met in this case. The trial court conducted the permanency hearing when N.V. was 18 months of age, placed custody of the child with the only relative identified by the mother, and apparently scheduled no further court reviews. DHR had apparently met its responsibility, mandated by § 12-15 — 65(g) and (m), to provide reasonable efforts to facilitate family reunification. Notably, T.V. never challenges the sufficiency of DHR’s reunification efforts in the first 18 months of N.V.’s life. Instead, T.V. argues that DHR should have reinstated those efforts in December 2003, when she filed for visitation and “ultimately the return of custody.” The majority agrees with T.V. and relies on D.O. v. Calhoun County Department of Human Resources, 859 So.2d 439, 444 (Ala.Civ.App.2003) (citing R.C. v. Nachman, 969 F.Supp. 682 (M.D.Ala.1997)), for the proposition that “ ‘DHR has an affirmative duty to facilitate family reunification whenever that goal is possible.’ ”
The majority’s reliance on D.O. and R.C. is, however, misplaced. First of all, in D.O., DHR held custody of the child and petitioned for termination of parental rights. Second, R.C., cited in D.O., dealt specifically with a plaintiff class of “all children who are now, or in the future will be, children in foster care and/or DHR custody who have emotional or behavioral disorders.” 969 F.Supp. at 687. N.V. was never placed in foster care by DHR. Except for the willingness of B.S. and her husband in June 1999 to accept N.V. into their home at the mother’s suggestion, N.V. might well have gone into foster care when the mother was arrested at the child’s birth. Instead, DHR and the trial court did precisely what 42 U.S.C. § 675(5)(A)(c) prescribes. DHR placed the child with a relative identified by the mother in a “safe setting that is the least restrictive ... and most appropriate setting available”, and subsequently held a permanency hearing. The trial court, as § 12-15-71 (a)(3)(c) prescribes, placed N.V. with a relative, who, after a study by DHR, was found by the court to be qualified to receive and to care for the child. Apparently, DHR then closed its protective-services case, and the court discontinued court reviews because N.V. had been placed with a relative in a “permanent” situation. To expand the principles of D.O. to this case when DHR had afforded reasonable efforts over 18 months to reunite a newborn infant with his mother, and those efforts failed because of the mother’s neglect of her child and her substance abuse, is to expand the principles of R.C. to the detriment of children by eliminating permanency.
Given the evidence, had DHR, at the permanency hearing in December 2000, filed a petition to terminate T.V.’s parental rights and advocated “permanent” custody with B.S., a relative identified by the mother, the agency clearly could have sustained its evidentiary burden for legally severing all ties of the mother. Because DHR simply sought instead “permanent” custody with B.S. at the permanency hearing, and did not file a petition to terminate T.V.’s parental rights, N.V.’s permanency is now at risk. T.V.’s intentions are clear. After abandoning her child for four years, she now seeks not only visitation, but also “ultimately return of custody.”
The trial court was able to view the demeanor of the witnesses and to assess their credibility, and after doing so found T.V. to have abandoned her child and found that it would be contrary to the best interest of the child, at five years of age, to have contact with his biological parent, who is virtually a stranger to him. The trial court further found that given the mother’s abandonment and her status of a stranger to her child she is unable now *20 and in the foreseeable future to properly discharge her responsibilities to and for her child. We should not, under the ore tenus standard of review, reweigh the evidence and find otherwise. Therefore, I dissent.
STUART and BOLIN, JJ., concur.