PER CURIAM.
M.B. (“the mother”) became pregnant with R.B. (“the child”) when she was 12 years old and living in Puerto Rico. The mother relocated to the United States, where the child was born in May 2006. In June 2006, the mother moved with the child to Alabama, where she began residing with her sister. The mother testified that her sister did not allow the mother to attend school regularly and that her sister made her care for the child and the sister’s children. The mother and her sister had a verbal altercation, after which her sister kicked the mother out of her home.
The Jefferson County Department of Human Resources (“DHR”) became involved with the mother and the child in August 2006, when DHR sought and received a pick-up order relating to the child. In January 2007, the Jefferson Juvenile Court, based on the stipulation of the parties, determined that the child was dependent, awarded legal and physical custody of the child to DHR, and ordered the mother to complete a parenting-skills course and to comply with reunification efforts made by DHR. Because the mother was herself a minor, the juvenile court noted that she was being placed in a foster-care placement with the child.
Over the next two years, the mother and the child resided in six different foster-care placements, all of which the mother disrupted. Caren Hampton, the DHR social worker overseeing the mother’s case, testified that she had not received any information indicating that the mother was not properly caring for the child during that time. Hampton further testified that, throughout that period, “[t]here was no major concern about [the child’s] safety.”
The mother was moved to a group home in November 2008, after she disrupted her previous foster-care placement by sneaking a boy into the home. At that time, the child was placed in a separate foster-care placement from the mother. The mother consistently visited with the child despite their separation.
During her last foster-care placement, the mother gave birth to her infant daughter, K.B. After leaving her last foster-care placement in May 2011 upon her graduation from high school, the mother was placed in an independent-living program with the Safe Alternatives for Families and Youth (“SAFY’). She was placed in her own apartment, and K.B. was placed with her.
The mother had been having consistent, unsupervised weekend visitation with the child until September 2011. According to Hampton, those visits initially went well; Hampton testified that she had not received any information that the mother was putting the child in any type of danger during the unsupervised visitations. In fact, Caren Hampton, the DHR social worker assigned to the mother and the child, testified on cross-examination as follows:
“Q: Okay. From the time that [the mother] was given unsupervised visits until the date prior to the September [2011] court date, have you got any calls stating that [the mother] was putting her child in any type of danger?
“A: No.
“Q: So the visits w[ere] going well up until that point?
“A: Yes.”
However, in September 2011, the mother had her unsupervised weekend visitation with the child suspended. Hampton *1160 testified that DHR had made a determination in September 2011 to suspend the mother’s unsupervised visitation with the child and to remove K.B. from the mother’s home based primarily on the photograph of the child making a gesture, known colloquially as “flipping the bird,” that had appeared on the mother’s Face-book page, which, according to Hampton, DHR had characterized as poor parenting. It was undisputed that that photograph had been placed on the mother’s Facebook page by T., a friend of the mother’s, and that the mother did not have the means or knowledge to remove the photograph. Around that same time, the child reported that the mother had weapons in her apartment; the mother denies having had weapons in her apartment, but she did say that the child had overheard a conversation in which she asked how old she had to be to purchase a gun. The mother testified that she had since ended relationships with persons who, in her opinion, were a bad influence on her.
The mother was attending Virginia College at the time of trial, and she was scheduled to start a job at a fast-food restaurant the day following the trial; she testified that she would earn $7.25 per hour at that job. She explained that as a ward of the state she received $845 per quarter to go to school and that she paid $50 of that money as rent. She did not testify concerning payment of other expenses, but she did admit that she could not live independently without assistance from SAFY. She said that SAFY would provide $150 for food but that she received food stamps instead. The mother said that she wanted to save money to buy an automobile and that she had already saved $900. She also explained that, when she began working, she would have to pay some money to SAFY and that SAFY would put the money in an account so that she would have money when she left the program.
DHR filed a petition to terminate the mother’s parental rights to the child in November 2010. According to Hampton, the decision to seek termination of the mother’s parental rights was based upon the length of time the mother and the child had been in foster care and upon the behavior of the mother during that period. Hampton noted that DHR had considered the behaviors of the mother that had disrupted her foster-care placements and had resulted in the child’s being placed in a separate foster-care placement. Hampton further explained that DHR had concluded that the mother “ha[d] not gathered the resources or tools to redefine herself and change her behaviors.”
After a trial in November 2011, the juvenile court entered a judgment on December 6, 2011, terminating the mother’s parental rights to the child. The mother filed a timely postjudgment motion, which was denied. She then timely appealed the judgment terminating her parental rights to this court.
“A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, 954 (Ala.1990).”
B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004). A juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988). “Clear and convincing evidence” is “ ‘Evidence that, when weighed against evidence in opposition, will produce in the mind of *1161 the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting Ala. Code 1975, § 6-11-20(b)(4)).
The termination of parental rights is governed by Ala.Code 1975, § 12-15-819. That statute reads, in part:
“(a) If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child and to terminate the parental rights, the juvenile court shall consider the following factors including, but not limited to, the following:
[[Image here]]
“(7) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
[[Image here]]
“(12) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.”
On appeal, the mother argues that the record does not contain clear and convincing evidence to support the juvenile court’s decision to terminate her parental rights to the child. She notes that she was still a minor at the time her parental rights were terminated, and she contends that the evidence indicated that, in fact, her conduct or condition was likely to change in the foreseeable future because she was enrolled in college and had stopped associating with people who were a bad influence. We agree that the evidence presented at the trial does not support the conclusion that termination of the mother’s parental rights was warranted at this time.
“This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.”
D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ.App.2003). We determined in D.O. that the mother in that case had taken the necessary steps to improve her circumstances, including seeking employment and continuing to pursue alcohol-abuse counseling, such that, at the time of the termination trial, termination of her parental rights was not warranted based on her current circumstances. D.O., 859 So.2d at 443-44; see also K.M. v. Shelby Cnty. Dep’t of Human Res., 628 So.2d 812 (Ala.Civ.App.1993) (holding that termination of parental rights was premature when evidence showed that minor mother, who had previously suffered from behavioral problems and who had previously run away from 11 foster-care placements, had begun stabilizing so as to become a good parent by time of trial).
Although the mother conceded that she had exercised poor judgment in respect to *1162 the photograph, that indiscretion does not amount to parental abuse, neglect, or harm that would justify suspension of her unsupervised visitation with the child, see K.D. v. Jefferson Cnty. Dep’t of Human Res., 88 So.3d 893 (Ala.Civ.App.2012), much less termination of her parental rights. See Santosky v. Kramer, 455 U.S. 745, 764, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (quoting Addington v. Texas, 441 U.S. 418, 427, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)) (holding that clear-and-convincing-evidence standard is intended to prevent courts from terminating parental rights based on “ ‘a few isolated instances of unusual conduct [or] ... idiosyncratic behavior’ ”). Without that interruption, it appears that the family would have been progressing toward reunification, the goal established by DHR and our legislature. See § 12-15-101(b)(3), Ala.Code 1975.
Based on our review of the record, we conclude that the evidence does not support the juvenile court’s finding that the mother’s “conduct or condition [is] such as to render [the mother] unable to properly care for the child and such conduct or condition is unlikely to change in the foreseeable future.” As Hampton admitted, DHR made the decision to seek the termination of the mother’s parental rights based on her disruption of her past foster-care placements, not on her current circumstances. The record reflects that, despite some poor behavior in her foster-care placements, the mother in the present case, like the mother in D.O., has taken steps to improve her circumstances. Although some evidence in the record indicates that the mother has exercised poor judgment at times, the overall tendency of the evidence reflects that the mother has progressed and has gained skills for independent living.
Therefore, we conclude that the evidence indicates that the mother could, in the foreseeable future, become a suitable parent. Her graduation from high school, her decision to attend Virginia College, and her taking a full-time job at a fast-food restaurant show that the mother has made efforts to become more self-sufficient. Her decision to end relationships she had determined to be detrimental to her success is also indicative of her desire to improve her circumstances for the benefit of the child. Based on the evidence in the record before this court regarding the mother’s current conditions, we cannot agree that termination of the mother’s parental rights is warranted at this time. Accordingly, we reverse the judgment of the juvenile court terminating the parental rights of the mother, and we remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and MOORE, JJ., concur.
THOMPSON, P.J., concurs in the result, without writing.
THOMAS, J., dissents, without writing.