MOORE, Judge, dissenting.
C.M. ("the father") appeals from a judgment entered by the Jefferson Juvenile Court ("the juvenile court") terminating his parental rights to J.C.M. ("the child").
On appeal, the father first argues that the trial court exceeded its discretion by denying his request for a continuance of the trial because the father was allegedly ill. I conclude that, because the father failed to present evidence proving that he was too ill to attend the trial, this court cannot reverse the juvenile court's judgment on the basis that the juvenile court exceeded its discretion in denying his motion for a continuance. See S.C.D. v. Etowah Cty. Dep't of Human Res., 841 So.2d 277, 278 (Ala. Civ. App. 2002), and Ex parte Russell, 911 So.2d 719, 725 (Ala. Civ. App. 2005) ). Nevertheless, for the reasons expressed below, I conclude that the juvenile court's judgment should be reversed.
The father also argues that there was not clear and convincing evidence indicating that he was unable or unwilling to care *1026 for the child. Section 12-15-319(a), Ala. Code 1975, provides, in pertinent part:
"If the juvenile court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parent[ ] of a child [is] unable or unwilling to discharge [his or her] responsibilities to and for the child, or that the conduct or condition of the parent[ ] renders [him or her] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parent[ ]."
In the present case, Sabrina Boswell, a caseworker with the Jefferson County Department of Human Resources ("DHR"), testified that the case had originated in March 2015 when DHR received a report that the child's mother, S.M. ("the mother"), who was married to the father at that time, had posted on Facebook, a social-media Web site, that she had given the child, who was less than two months old, mashed potatoes and rice cereal mixed with his formula, as well as ice cream. Boswell also testified that the mother had posted on Facebook that she had given the child melatonin and that he had slept almost 12 hours. The evidence indicated that, when DHR arrived at the family's house, there were at least seven dogs in the house and the house was in disarray, contained mold, and smelled like animal waste. Boswell admitted, however, that a nurse had informed DHR's workers that the food and melatonin that the parents had given the child had not been harmful to the child. Boswell testified that, because the mother and the father had denied the allegations against them, they had ultimately been found "not indicated" for abuse or neglect. Nonetheless, the child was found to be dependent, DHR was awarded custody of the child on March 20, 2015, and the child was placed into foster care at that time.
Boswell testified that DHR had developed a reunification plan that had required, among other things, that the father submit to a psychological evaluation and follow the recommendations from that evaluation; obtain stable housing and employment; and complete parenting, domestic-violence, and anger-management classes. Patrick Dunne, a licensed professional counselor at the time of the father's psychological evaluation, testified that he had performed a psychological evaluation on the father and that evaluation had resulted in a provisional diagnosis of a personality disorder and recommendations that the father attend parenting classes, have drug screens, and maintain stable housing and employment.
Boswell testified that the father had completed parenting classes and had maintained stable employment at a pizza restaurant. She testified, however, that the father had declined to complete anger-management or domestic-violence classes and had also not completed the in-home parenting services. She testified that the father did not think that he needed the anger-management or domestic-violence classes, although, she said, there was evidence indicating that the father had hit the mother during their marriage and had yelled at Boswell and one of the in-home services workers.
The father and the mother had separated before the termination-of-parental-rights trial. Boswell testified that, for at least six months preceding the trial, the father had lived in a room in a house that he had been subleasing from the tenants of the house. She testified that the father was paying rent of $100 per week. Boswell testified that the father's plan was for the child to share a bedroom with the minor daughter of the tenants of the house. She testified that DHR had no safety concerns regarding the house at which the father *1027 was living but that DHR was concerned because the father's name is not on the lease of the house.
Boswell testified that the father had consistently visited the child and had bought some gifts for the child, but, she said, he had not paid any monetary support for the child. Destiny Love, a clinical therapist with the in-home parenting-services provider, testified that the father had told her that the mother had prevented him from completing the in-home parenting services and that he had expressed interest in resuming those services.
"This court has held that evidence of current conditions or conduct relating to a parent's ability or willingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." Bowman v. State Dep't of Human Res., 534 So.2d 304, 306 (Ala. Civ. App. 1988). In the present case, the evidence of the father's current conditions and conduct at the time of the trial was that he had separated from the mother, had maintained stable employment, had maintained safe housing, had completed parenting classes, and had maintained visits with the child. The father had also indicated a willingness to resume in-home parenting services. Although the father had declined to complete anger-management and domestic-violence classes, there was no indication that the father had ever acted in anger or been violent toward the child. Considering the father's current circumstances, I cannot conclude that the juvenile court was presented with clear and convincing evidence indicating that the father is "unable or unwilling to discharge [his] responsibilities to and for the child, or that the conduct or condition of the [father] renders [him] unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future." § 12-15-319(a).
In D.O. v. Calhoun County Department of Human Resources, 859 So.2d 439, 444 (Ala. Civ. App. 2003), this court reasoned that, when there was evidence indicating that the parent had "made a continuing effort to change her circumstances and that she was making significant progress at the time of the termination hearings," the judgment terminating her parental rights was premature and, therefore, was "plainly and palpably wrong." Similarly, in the present case, the father had made continuing and consistent efforts to change his circumstances and was making significant progress at the time of the trial.
" '[T]he termination of parental rights is a drastic measure, and we know of no means by which those rights, once terminated, can be reinstated. The evidence in [this case] "does not rise to the level of being so clear and convincing as to support termination of the parental rights of the [father], such action being the last and most extreme disposition permitted by statute." ' "
D.O., 859 So.2d at 445 (quoting V.M. v. State Dep't of Human Res., 710 So.2d 915, 921 (Ala. Civ. App. 1998), quoting in turn East v. Meadows, 529 So.2d 1010, 1012 (Ala. Civ. App. 1988) ).
Based on the foregoing, I conclude that the juvenile court's judgment terminating the father's parental rights is not supported by clear and convincing evidence, and, therefore, I would reverse the juvenile court's judgment.